IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| TIFFANY MEYER, f/k/a<br>TIFFANY CAVORETTO,<br><br>    Plaintiff,<br><br>v.<br><br>ST. JOHN'S HOSPITAL OF THE<br>HOSPITALSISTERS OF THE THIRD<br>ORDER OF ST. FRANCIS,<br><br>    Defendant. | CASE NO.  153313 |

### PLAINTIFF'S MOTION FOR LEAVE TO AMEND SCHEDULING ORDER, OR, IN THE ALTERNATIVE, STRIKE THE OPINION TESTIMONY OF COLLEEN STAUFFER

COMES NOW Plaintiff, Tiffany Meyer, and respectfully requests to amend the Scheduling Order (doc. #14) of the Court dated March 4, 2016, or, alternatively, strike the opinion testimony of Colleen Stauffer.  In support thereof, Plaintiff states as follows:

    1.    This is a disability discrimination case brought under Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.*  Plaintiff alleges that Defendant failed to accommodate her disability and fired her because of it and because she requested an accommodation for it.  Plaintiff was employed as a dietician for four years with the Defendant hospital.  On July 8, 2014, Colleen Stauffer, Plaintiff's then-supervisor, summarily fired her, complaining about Plaintiff's lack of "adaptability" and offering reasons for the discharge, such as her supposed lack of commitment to the hospital's "core values."  To support this conclusion, Ms. Stauffer claims Plaintiff failed an audit of her patient charts and that her dietetic recommendations for two patients whose charts Ms. Stauffer audited demonstrated incompetence.

2. The Scheduling Order in this action set the deadline for Plaintiff to identify testifying experts as October 11, 2016, and the deadline for Defendant to identify experts as December 11, 2016.

3. Defendant has not identified any expert witnesses in this case.

4. Under Rule 16(b)(4), a schedule may be modified for good cause and with the Judge's consent.

5. Under Rule 26(a)(2)(D), expert disclosures intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(C) must be made within 30 days after the other party's disclosure.

6. Plaintiff took Colleen Stauffer's deposition on March 7, 2017.  Ms. Stauffer was not only Plaintiff's former supervisor but also the manager of Defendant's dieticians.  She is a dietician by training and experience.  Ms. Stauffer conducted an audit of the dieticians' patient charts in late June 2014.  Ms. Stauffer claims two dieticians failed the chart audit—Plaintiff and a non-disabled dietician named Karen Morton.  Defendant placed Ms. Morton on a performance improvement plan, whereas Plaintiff was immediately fired without warning.

7. Rule 701 of the Federal Rules of Evidence provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

8. The advisory committee notes for the 2000 amendment to Rule 701 explain that "any part of a witness's testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules."

9. In her deposition, Ms. Stauffer testified at length concerning the alleged deficiencies with Plaintiff's dietetic recommendations for two patients (denoted in this motion as Patients B and H) that led Ms. Stauffer to conclude that (i) Plaintiff failed the patient chart audit, and (ii) her clinical misjudgment justified her immediate discharge. Ms. Stauffer's testimony in this regard was based on her specialized medical knowledge as a registered dietician. She provided opinion testimony as to the patients' medical treatment, Plaintiff's dietetic recommendations in light of the patients' medical conditions, and the possible medical consequences of Plaintiff's dietetic recommendations. The following is a sampling of the opinion testimony Ms. Stauffer offered:

- Q: So you thought that Tiffany should have put this patient, [Patient H], on Vital[1] because it would be easier for the patient to absorb and digest, and she didn't do that. That's what you thought was the patient safety issue with her?

  A: I knew that was the patient safety issue with her. She should have done it as soon as she saw the patient. It should have been done on her initial assessment.

  *See* Stauffer Dep. at 188:5-13; excerpts of Stauffer's deposition are attached as Exhibit A.

  ***

- Q: Why didn't you think that it was appropriate to provide Tiffany Meyer with tools to succeed base on the chart audits that you saw that she did?

  A. If you refer back to one of these exhibits, I cannot teach basic nutrition 101. She should have known that. That's not teachable. I can reteach the Nutrition Care Process. I can't teach somebody how to critically -- and not almost kill someone.

  Q. You're saying that she almost killed [Patient B]? Is that your testimony? A nutritional assessment almost killed a patient?

  A. No.

---

[1] Vital is a therapeutic nutrition for tube or oral feeding.

Q. Then what are you referring to when you said, and almost kill somebody? You're saying Tiffany Meyer's actions almost killed a patient at St. John's Hospital?

A. It could have. It was severe. But I'm not referring to the first chart audit.

Q. You say it could have. That's just pure speculation on your part because there was a doctor who was actually in charge of the care of [Patient B] at all times. Is that right?

A. I'm not talking about [Patient B].

Q. What are talking about then?

A. [Patient H].

*See* Ex. A at 208:17—209:16.

*** 

- Q. So you're telling me that a nutritional assessment and a diagnosis and a recommendation from the dietitian as to [Patient H] or [Patient B] could have killed either one of those patients? That's your testimony?

  {Objection omitted}

  A: Yes.

  *Id.* at 270:4—12.

***

- Q. Did you put that in any record? I mean, you created a lot of records about -- a lot of emails. Did you put, in any email that you can point me to or any record that you created regarding Tiffany Meyer, that her actions, with respect to these two patients, could have resulted in one of the patients dying?

  A. I'm not sure if I wrote it down, but I went into the fact that the one was actively refeeding when she saw them. And when somebody is refeeding, you do not start them on tube feeds right away at full strength. And that's what she did. You need to replete the electrolytes. And I went into the chart audit and I said, this potassium is down, the phosphorus is down, the glucose is up.

  Q. Are you talking about [Patient B]?

  A. No. I'm talking about [Patient H].

4

> Q. So you're saying that she started him right back up on a full tube-feeding regimen after he came off the nothing-by-mouth TPN?
>
> A. No. So he wasn't on nothing-by-mouth TPN. He was NPO.
>
> Q. Yeah, that's what I mean. He was NPO when she first did the assessment.
>
> A. So when you see the patient, you gradually -- you give recommendations. You increase whatever you're giving them by 10 to 15 ml's every eight hours. And you don't advance to goal in 24 hours or 48 hours. So you have to slowly increase it because this patient hasn't been fed for a very long time, and if they're just given a lot of feeding, what happens is their electrolytes plummet, which can cause cardiac arrest.
>
> *See* Ex. A at 270:15—271:21.

***

- > Q: Did you think it was appropriate to have this patient [Patient B] be given a general diet so that the patient would have as much choice as possible to try to put on weight?
  >
  > A. Absolutely not. The recommendation states --and it's not even a recommendation -- best practice is, the patient comes into the hospital, and if they had lost that much weight and are deemed malnourished upon admission, that they should be put on TPN, especially if they're not tolerating anything by mouth, which the patient was not.
  >
  > *Id.* at 194:21—195:6.

***

- > Q. So your concern here was that she – her nutrition plan didn't account for sufficient protein?
  >
  > A. My concern was, when she looked at the record, she reviewed the labs, the potassium was low, the glucose was high. 622, it was a critically low potassium, and this was never mentioned. So her intervention should have tied into these lab values. Her intervention should have tied into the fact that the patient had 12 wounds and was provided more protein. She didn't even state that the patient had a wound on her initial assessment. Also -- let's look and see -- the patient, [Patient H], was not tolerating the tube feed, had abdominal distention and diarrhea. The tube feed should have been changed

5

to Vital on the initial assessment. Putting patient on the Vital would have been evidence-based. And not only would it have been evidence-based; it would have helped the tolerance. So those were my concerns when I saw this.

*See* Ex. A at 234:17—235:10.

***

- Q. (By Mr. Westhoff) And if the medical records don't reflect that he [Patient H] had diarrhea, would that then not be a call for Vital and, instead, suggest that he should have –

    A. No.

    Q. -- been put on some other nutrition program?

    A. The fact that he was admitted with abdominal distention, and I know that he had a lot of GI issues -- the Vital is for GI tolerance. She documented her nutrition diagnosis is pertinent to assessment. She didn't even note that the patient had altered GI function, but that was the reason the patient was here. So just because he -- what was the question, the diarrhea, if he didn't have diarrhea? Even if he didn't have diarrhea and he just had abdominal discomfort, abdominal distention, any kind of GI distress or any type of malabsorption, he should have been put on the Vital as soon as he came in.

    *Id.* at 236:5—22.

***

- Q. (By Mr. Westhoff) Ms. Stauffer, I want to direct your attention back to Lucas Exhibit 8, which is the low performer list, and the Karen Morton section. When you indicate, in this list for Karen Morton, the issues that she was having, that on 6/24 an RN complained that Karen saw a patient, did not enter the order, it was a patient -- it was a TF patient, that that's a patient safety issue, that was for an actual patient; that wasn't for a hypothetical patient that this RN was complaining about. Correct?

    A. So it was one RN that made this complaint. And as soon as she made the complaint, the tube feed was entered.

    Q. And it was for a real patient, correct?

6

>    A.   It was for a real patient.
>
>    Q.   And then the last --
>
>    A.   The patient was not harmed.
>
>    Q.   -- the last item that you put down here was -- well, none of the patients were harmed that Tiffany Meyer -- neither [Patient B] nor [Patient H] were harmed, were they?
>
>    A.   She prescribed the wrong diets both times.
>
>    Q.   Right.  And so how did that harm them?
>
>    A.   Well, with [Patient B], [Patient B]'s diarrhea continued.  It didn't cease.  She could have done TPN, rested the bowel, and the patient would have been more comfortable.  With [Patient H], had she started the patient on -- excuse me -- had she started the patient on Vital, he would have never had to go to bowel rest.
>
>    Q.   You're not a doctor, are you, Ms. Stauffer?
>
>    A.   No, but I'm a registered dietitian and I have this training.
>
>    *See* Ex. A. at 266:2—267:8.
>
>    ***
>
> - Q.   (By Mr. Westhoff) You don't have a medical background as a doctor to be able to say with any sort of certainty what would cause the diarrhea for somebody like [Patient B]?
>
>    {Objection omitted}
>
>    A.   I have the background as a registered dietitian that she did not make the proper intervention.  If she had made the proper intervention, we may have seen different outcomes.
>
>    *Id.* at 267:24—268:8.

10. It is undisputed that Ms. Stauffer's knowledge of Plaintiff's dietetic recommendations for the two patients in question came from her review of the charts in

7

connection with the audit. Indeed, Defendant has pointed to Plaintiff's purported failure to pass the chart audit, and her alleged clinical incompetence gleaned from the chart audit, as the reason for her abrupt discharge. Ex. A 186:6—187:1; 189:16—190:7; 196:4—197:1; *see also* Stauffer Deposition Exhibits 15 and 16, attached as Exhibit B; and Lucas Deposition Exhibit 10, attached as Exhibit C.

11. To rebut the opinion testimony of Ms. Stauffer, Plaintiff identified Julie Ulery, a former manager over the dieticians at Defendant's hospital, as an expert witness on March 22, 2017, six days before her scheduled deposition. Plaintiff identified only those topics on which Ms. Stauffer opined as opinions she expected to elicit from Ms. Ulery.

12. On March 23, 2017, during a phone conference with Defendant's counsel, Plaintiff's counsel offered to retract the disclosure of Ms. Ulery as an expert witness if Defendant agreed to limit Ms. Stauffer's testimony to statements based on her observations or perceptions and that are *not* based on scientific or specialized knowledge. Defendant's counsel declined this request.

13. Defendant has now moved to strike Ms. Ulery as an expert witness (doc. #38). Defendant wants to have its cake and eat it too. It wants to skirt the expert disclosure obligations of the Scheduling Order and requirements of Rule 26(a)(2) by having Ms. Stauffer, undisclosed as an expert witness, offer opinion testimony based on her scientific knowledge as a dietician, while barring Plaintiff from rebutting such testimony. The 2000 amendment to Rule 701 was "designed to avoid this very situation—to prevent parties from 'proferring an expert in lay witness clothing." Rule 701 (advisory committee notes); *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Inter'l, Inc.*, 533 F.3d 555, 561 (7th Cir. 2008).

14. In this situation, fundamental fairness militates towards amending the Scheduling Order to allow Plaintiff to identify Ms. Ulery as a rebuttal expert witness, or striking the opinion testimony of Ms. Stauffer as it relates to the medical treatment, dietetic recommendations, and potential medical consequences of those recommendations, for Patients B and H.

WHEREFORE, Plaintiff requests that the Court amend the Scheduling Order to allow for Plaintiff to identify Ms. Ulery as an expert witness, or, alternatively, strike the opinion testimony of Ms. Stauffer.

Respectfully Submitted,

SEDEY HARPER WESTHOFF, P.C.
Attorneys for Plaintiff

*/s/ Benjamin F. Westhoff*
Benjamin F. Westhoff, #6282206
Jessica M. Scales, #6310108
John D. Lynn, #30064MO
2711 Clifton Ave.
St. Louis, MO 63139
314/773-3566
314/773-3615 (fax)
bwesthoff@sedeyharper.com
jscales@sedeyharper.com

**CERTIFICATE OF SERVICE**

   The undersigned attorney hereby certifies that on March 27, 2017, the foregoing document was filed electronically with the Clerk of the Court using the ECF system which will provide electronic service to the following attorneys for defendant:

Stephanie Dodge Gournis (ARDC # 6215978)
Shavaun Adams Taylor (ARDC # 622172)
DRINKER BIDDLE & REATH LLP
191 North Wacker Drive, Suite 3700
Chicago, Illinois 60606
Telephone: (312) 569-1000
Fax: (312) 569-3330
Stephanie.dodgegournis@dbr.com
Shavaun.taylor@dbr.com

                */s/ Benjamin F. Westhoff*